**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JACOBS TELECOMMUNICATIONS, INC.<br><br><br>Plaintiff,<br><br>v.<br><br>COLONY INSURANCE COMPANY AND RSUI INDEMNITY COMPANY,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 1:17-cv-01112 |

**JACOBS TELECOMMUNICATIONS, INC.'S COMPLAINT FOR
(1) BREACH OF CONTRACT; (2) DECLARATORY RELIEF; (3) VIOLATION OF
TEXAS INSURANCE CODE SECTION 541; (4) VIOLATION OF TEXAS
INSURANCE CODE SECTION 542; AND (5) COMMON LAW BAD FAITH**

Plaintiff Jacobs Telecommunications, Inc. ("Jacobs"), for its Complaint against Defendants Colony Insurance Company ("Colony") and RSUI Indemnity Company ("RSUI"), upon knowledge, information and belief, alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Jacobs brings this action against Colony and RSUI, seeking a declaratory judgment against RSUI, and seeking damages for breach of contract, declaratory judgment, violation of Texas Insurance Code Sections 541 and 542, and bad faith due to (1) Colony Insurance Company's failure to comply with its defense obligations under the Commercial General Liability Policy described below; (2) Colony Insurance Company's unexcused delay in providing Jacobs with its coverage denial position until less than two months before trial in the underlying catastrophic personal injury action; and (3) Colony Insurance Company's failure to settle the underlying action within the $1 million limits of the

Commercial General Liability Policy, thereby subjecting Jacobs to an unreasonable risk of a liability for an excess judgment.

## PARTIES

2.     Plaintiff Jacobs is a corporation duly organized under the laws of the State of New Jersey, with its principal place of business located in Edison, New Jersey.  Accordingly, Jacobs is a citizen of New Jersey within the meaning of 28 U.S.C. § 1332(a) and 28 U.S.C. § 1332(c)(1).  Jacobs legally transacts business in the State of Texas and within the geographical jurisdiction of this Court.

3.     Upon information and belief, Defendant Colony Insurance Company is a corporation duly organized under the laws of the Commonwealth of Virginia, with its principal place of business located in Richmond, Virginia. Accordingly, Colony is a citizen of Virginia within the meaning of 28 U.S.C. § 1332(a) and 28 U.S.C. § 1332(c)(1).  Upon information and belief, Colony transacts business in the State of Texas and within the geographical jurisdiction of this Court.  Upon information and belief, Colony is an eligible surplus lines insurance company registered with the Texas Department of Insurance with a registered address in San Antonio, Texas, within this judicial district.  Pursuant to Tex. Ins. Code § 804.106(b) Colony has irrevocably appointed the Texas Secretary of State as agent for service of process arising from the Colony's engaging in the business of insurance in Texas.

4.     Upon information and belief, Defendant RSUI is a corporation duly organized under the laws of the State of Georgia with its principal place of business located in Atlanta, Georgia.  Accordingly, RSUI is a citizen of Georgia within the meaning of 28 U.S.C. § 1332(a) and 28 U.S.C. § 1332(c)(1).  Upon information and belief, RSUI transacts business in the State of Texas and within the geographical jurisdiction of this Court.  Upon information and belief, RSUI is an active foreign insurance company registered to transact business with the Texas Department of Insurance with a registered agent for service in Austin, Texas, within this judicial district.

## JURISDICTION AND VENUE

5.      This Court possesses subject matter jurisdiction under 28 U.S.C. § 1332.

6.      Venue is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### A.      Jacobs' Contracts With BTE

7.      On August 31, 2011, AT&T entered into a contract with Jacobs titled Turf Program Agreement Number 20110819.002.C. (the "Turf Agreement'). Under the Turf Agreement, AT&T retained Jacobs to upgrade its cellular tower systems to 4G LTE.

8.      On December 2, 2011, Jacobs and BTE Management Group, LLC ("BTE Management") entered into a Standard Subcontractor Agreement ("Subcontractor Agreement") for "Work in Support of Construction and Tower Site Maintenance," including Tower Inspection and Tower Services at various locations across the United States.

9.      On February 8, 2012, Jacobs and BTE Management entered into an Indefinite Delivery Subconsulting Agreement ("Subconsulting Agreement"). Under the Subconsulting Agreement, BTE Management agreed to render specific services on a Delivery Order basis.  A true and correct copy of the Subconsulting Agreement is attached hereto as Exhibit A.

10.     The Subconsulting Agreement provides that "The laws of the State of Texas (excluding any laws that direct the application of another jurisdiction's laws) govern all matters arising out of or relating to this Agreement and all of the transactions it contemplates, including its validity, interpretation, construction, performance, and enforcement." *See* Ex. A, Attachment F [Special Conditions], Section 13.

11.     Under the Subconsulting Agreement, BTE Management agreed to defend and indemnify Jacobs. Specifically, Attachment A [Term and Conditions] to the Subconsulting Agreement states as follows:

> 1.  THE PRIME CONTRACT:
>
> (a) The Prime Contract [Turf Agreement] is hereby incorporated as part of this Agreement, and Subconsultant [BTE] acknowledges

that it is familiar with and understands all of the documents which form a part of the Prime Contract. In addition to the provisions of this Agreement, Subconsultant agrees to be bound to Jacobs and to assume toward Jacobs all the obligations, liabilities, responsibilities, conditions, requirements, all representations and certifications, and duties that Jacobs, by the Prime Contract or applicable laws, assumes toward or is bound to Owner [AT&T], directly or indirectly, insofar as the Prime Contract and the applicable law apply to the services to be performed under this Agreement. . . . This Section applies to administrative, procedural and risk allocation provisions of the Prime Contract as well as to provisions of the Prime Contract dealing with the scope and character of the services to be performed.

(b) WITHOUT LIMITING THE GENERALITY OF THE PREVIOUS PARAGRAPH AND FOR ADDITIONAL CLARITY, SUBCONSULTANT AGREES TO DEFEND, INDEMNIFY AND/OR HOLD HARMLESS JACOBS, ITS AFFILIATED COMPANIES AND THE OWNER, AND THE DIRECTORS, OFFICERS AND EMPLOYEES OF EACH OF THEM (THE "INDEMNITEES"), UNDER ALL OF THE SAME TERMS BY WHICH JACOBS IS OBLIGATED TO DEFEND, INDEMNIFY AND/OR HOLD HARMLESS THE OWNER UNDER THE VARIOUS PROVISIONS OF THIS AGREEMENT. WITHOUT LIMITATION, SUCH OBLIGATIONS SHALL ALSO APPLY TO CLAIMS, SUITS AND ACTIONS ASSERTED BY EMPLOYEES OF SUBCONSULTANT.

12.     In addition, Attachment A [Term and Conditions] to the Subconsulting Agreement states as continues, at Section 8 "INSURANCE AND INDEMNITY," as follows:

(a)  Subconsultant shall purchase and maintain at its own expense, insurance covering worker's compensation and employer's liability, automobile liability (all owned and non-owned vehicles), commercial general liability on an "occurrence" rather than "claims-made" basis. Professional liability insurance must also be maintained on a claims-made basis… The minimum limits of liability shall be as follows: "Refer to Attachment F – Special Conditions."

(b)  All of Subconsultant's insurance policies (except Worker's Compensation and Professional Liability) shall be endorsed to name Jacobs and the Owner [AT&T] as additional insureds. All of subconsultant's insurance policies (except Professional Liability) shall be endorsed to express the insurance carriers' waiver of all

rights of subrogation against Jacobs and Owner.  All Subconsultant insurance shall be primary insurance with respect to the additional insureds and will not participate with any other available insurance of Jacobs or the Owner.  Subconsultant shall require all subconsultants and suppliers of any tier of performing work at the Project or premises to have the same insurance as required of Subconsultant above (including additional insureds and waivers of subrogation) and shall provide evidence of it to Jacobs upon request.  Any insurance, limits of coverage, or the absence of them, shall not limit in any way Subconsultant's liabilities or obligations, or Jacobs's rights or remedies, under this Agreement or at law.

13.    Clause (e) of Section 8, titled "INSURANCE AND INDEMNITY," further provides that "[t]he Subconsultant shall defend, indemnify and hold the Indemnitees harmless from any and all claims and liens for labor, services or material furnished by the Subconsultant or its employees, agents and subconsultants under this Agreement."

14.    As mentioned above, under the Subconsulting Agreement, BTE Management agreed to procure Commercial General Liability insurance that includes AT&T and Jacobs, its Affiliates, and their directors, officers, and employees as "additional insureds."    BTE Management was required to obtain a primary Commercial General Liability policy with limits of at least $1 million per occurrence (at least $2 million aggregate) and an excess/umbrella policy with liability limits of at least $5 million per occurrence, both of which were to be primary over any insurance or self-insurance maintained by AT&T and Jacobs.    Attachment F to the Subconsulting Agreement specifies as follows:

3. The insurance coverage required by this Section includes:

*       *       *

ii.    Commercial General Liability insurance covering liability arising from premises, operations, personal injury, products/completed operations, and liability assumed under an insured contract (including the tort liability of another assumed in a business contract) and, specifically including bodily injury or property damage for removal and disposal operations with limits of at least:
- $2,000,000 General Aggregate limit

- $1,000,000 each occurrence limit for all bodily injury or property damage incurred in any one (1) occurrence
- $1,000,000 each occurrence limit for Personal Injury and Advertising Injury
- $2,000,000 Products/Completed Operations Aggregate limit
- $1,000,000 each occurrence limit for Products/Completed Operations
- $1,000,000 Damage to Premises Rented to You (Fire Legal Liability)

The Commercial General Liability insurance policy must:

1. Any Commercial General Liability insurance policy as respects Work to be performed under the Agreement and submitted by Contractor must be written on either:
   a. an Insurance Services Office (ISO) Form CG 00 01 or a substitute occurrence form providing equivalent coverage and which shall not contain a sunset provision, commutation clause or any other provision which would prohibit the reporting of a claim and the subsequent defense and indemnity that would normally be provided by the policy; or,
   b. an Insurance Services Office (ISO) Form CG 00 02 or a substitute claims made form providing equivalent coverage and for three (3) years following the term of this Agreement or completion of all Work associated with this Agreement, whichever is later. The retroactive date must precede the commencement of Work under this Agreement.

2. SUBCONTRACTOR is responsible for any losses, claims, costs of any kind which SUBCONTRACTOR's insurance does not cover.

3. include AT&T and Jacobs, its Affiliates, and their directors, officers, and employees as Additional Insureds on ISO endorsements:
   a. CG 20 10 (premises or operations) *AND* CG 20 37 (products or completed operations); or
   b. CG 20 26; or
   c. substitute form(s) providing equivalent coverage to a. or b. listed above.

   Contractor shall provide a copy of the Additional Insured endorsement to Jacobs. The Additional Insured endorsement may either be specific to Jacobs

or may be "blanket" or "automatic" addressing any person or entity as required by contract. A copy of the Additional Insured endorsement must be provided within sixty (60) days of execution of this Agreement and within sixty (60) days of each Commercial General Liability policy renewal;

\*        \*        \*

5.   include a waiver of subrogation in favor of AT&T and Jacobs, its Affiliates, and their directors, officers and employees; and

6.   be primary and non-contributory with respect to any insurance or self-insurance that is maintained by Jacobs

\*        \*        \*

iii.   Umbrella/Excess Liability insurance with limits of at least $5,000,000 each occurrence with terms and conditions at least as broad as the underlying Commercial General Liability, Business Auto Liability, and Employers Liability policies. Umbrella/Excess Liability limits will be primary and non-contributory with respect to any insurance or self-insurance that is maintained by AT&T and Jacobs.

\*        \*        \*

15.   Section 15, "**Indemnity**" (bold original) to Attachment F [Special Conditions] of the Subconsulting Agreement further states as follows:

Contractor [BTE] shall indemnify, hold harmless, and defend AT&T and Jacobs, its Affiliates, and their agents and employees, in accordance with this Section, against any Loss arising from or in connection with, or resulting from, the Materials or Services furnished by Contractor or Contractor's acts or omissions with respect to this Agreement. Contractor's duty to indemnify, hold harmless, and defend against Loss extends to Loss that may be caused or alleged to be caused in part, by the negligence of AT&T or Jacobs and other persons indemnified under this Agreement, to the fullest extent that such indemnification is permitted by applicable law.

16.   On December 7, 2012, BTE Management contracted with Jacobs through delivery order No. EPX0067U-14 to perform work at the Woodlawn Telecommunications

Tower owned by AT&T located at 3436 Winchester Road, Allentown, Pennsylvania 18104 (the "Woodlawn Tower" or "Cell Tower"). The Woodlawn Tower is a three-legged, 51-foot-high, self-supporting tower.

17.    BTE Management verbally contracted with B&T Engineering, Inc. ("B&T Engineering") (collectively, "BTE") to perform part of the work. As part of this work, BTE, acting as "B+T Group," subcontracted with Reliapole Inspection Services Company ("Reliapole") to provide the mapping of the Woodlawn Tower.

18.    On or about January 3, 2013, a BTE project manager uploaded the report issued by Reliapole onto the AT&T-managed Siterra database website. On January 7, 2013, BTE e-mailed the Reliapole report to Jacobs. Mr. Jeglum contends that BTE did not directly and independently identify the Tower's lack of a permanent safety climb system or ladder safety device and, although noting that there was no safety cable, did not recommend that a safety climb system be installed. On January 22, 2013 BTE completed its analysis report for the Woodlawn Tower. Mr. Jeglum contends that the analysis did not inform Jacobs or AT&T of the lack of a safety climb cable or the presence of loose, removable ladder rungs at the Woodlawn Tower.

**B.    The Colony Policy**

19.    Colony Insurance Company issued Commercial General Liability Policy No. GL900976 to BTE Management for the policy period from March 13, 2013 to March 13, 2014 (the "Policy"). The Policy contains a $1 million per occurrence limit of liability, subject to a general aggregate limit of $2 million and a $2,500 per claim deductible.

20.    Colony issued the Policy to BTE Management through Crump Insurance Services, a wholesale insurance broker located in Dallas, Texas.

21.    Upon information and belief, the Policy's Commercial General Liability Coverage Form insuring agreement states, in part, as follows:

**SECTION I — COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.**     **Insuring Agreement**

      **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" ... to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" ... to which this insurance does not apply.....

* * *

**SECTION V — DEFINITIONS**

* * *

**3.**     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

22.     The Policy contains several endorsements that provide additional insured coverage to certain parties under certain circumstances.

23.     <u>First</u>, Endorsement U649C-0111 provides additional insured coverage to all persons or organizations as required by written contract with BTE Management:

**CONTRACTORS PAC**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. **SECTION II — WHO IS AN INSURED** is amended to include as an additional insured all persons or organizations as required by written contract with the named insured, but only with respect to:

1. Liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" performed for that additional insured at the location(s) as designated in a written contract and included in the "products-completed operations hazard".

2. Liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

a.  Your acts or omissions; or
b.  The acts or omissions of those acting on your behalf;
in the performance of your ongoing operations for the additional insured(s) at the location(s) as designated in a written contract.

Colony Policy, Form U649C-0111.

24.  <u>Second</u>, Endorsement Form CG 20 10 07 04 provides additional insured coverage to all persons or organizations as required by written contract with the named insured:

**ADDITIONAL INSURED — OWNERS, LESSEES OR CONTRACTORS — SCHEDULED PERSON OR ORGANIZATION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Name of Additional Insured Person(s) Or Organization(s):** |
| --- |
| ALL PERSONS OR ORGANIZATIONS AS REQUIRED BY WRITTEN CONTRACT WITH THE NAMED INSURED. |
| **Location(s) Of Covered Operations:** |
| AS DESIGNATED IN WRITTEN CONTRACT WITH THE NAMED INSURED. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

A.  **Section II — Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
   *1.*  Your acts or omissions; or
   *2.*  The acts or omissions of those acting on your behalf;
   in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

B.  With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
   This insurance does not apply to "bodily injury" or "property damage" occurring after:
   1.  All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Colony Policy, Form CG 20 10 07 04.

25. <u>Third,</u> Endorsement Form U156C-0310 provides additional insured coverage to numerous named entities, including AT&T, under certain circumstances:

**ADDITIONAL INSURED —
OWNERS, LESSEES OR CONTRACTORS —
SCHEDULED PERSON OR ORGANIZATION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Name of Additional Insured Person(s) Or Organization(s) (Additional Insured):** |
|---|
| 1. GOODMAN NETWORKS INC., AND AT&T MOBILITY 6400 INTERNATIONAL PARKWAY, SUITE 1000 P[L]ANO, TX 75093 |
| **Location(s) Of Covered Operations:** |
|  |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. SECTION II — WHO IS AN INSURED** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:
This insurance does not apply to:

**Additional Insured Contractual Liability**

"Bodily injury" or "property damage" for which the additional insured(s) are obligated to pay damages by reason of the assumption of liability in a contract or agreement.

**Finished Operations at Work**

"Bodily injury" or "property damage" occurring after:

***1.*** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

***2.*** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization.

**Negligence of Additional Insured**

"Bodily injury" or "property damage" arising directly or indirectly out of the negligence of the additional insured(s).

C. It is agreed that should this policy be cancelled before the expirations date thereof, the issuing company will endeavor to mail 30 day written notice (10 days for non-payment of premium) to the additional insured, but failure to mail such notice shall impose no obligation or liability of any kind upon the company, its agent or representatives.

Colony Policy, Form U156C-0310.

*26.*  Fourth, Endorsement Form CG 20 37 07 04 provides additional insured coverage to AT&T for certain completed operations:

**ADDITIONAL INSURED — OWNERS, LESSEES OR
CONTRACTORS — COMPLETED OPERATIONS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| **Name of Additional Insured Person(s) Or Organization(s):** |
| --- |
| VELOCITEL INC. AND AT&T MOBILITY LLC<br>2415 CAMPUS DRIVE, SUITE 200<br>IRVINE, CA 92612 |
| |
| **Location And Description Of Completed Operations:** |
| AS DESIGNATED IN WRITTEN CONTRACT WITH THE NAMED INSURED |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**Section II — Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

Colony Policy, Form CG 20 37 07 04.

**C.      The RSUI Excess Policy**

27.      RSUI issued Commercial Excess Policy No. NHA062926 to BTE Management for the policy period from March 13, 2013 to March 13, 2014 (the "Excess Policy").  The Excess Policy contains a $5 million per occurrence limit of liability, subject to a general aggregate limit of $5 million.

28.      The Excess Policy's Excess Liability Insuring Agreement provides, in relevant part:

1.  Insuring Agreement

    a.  We will pay those sums in excess of the limits shown in Item 6 of the

        Declarations, Schedule of Underlying Insurance, that you become legally

obligated to pay as damages because of injury to which this insurance applies, provided that the "Underlying Insurance" also applies, or would apply, but for the exhaustion of its applicable Limits of Insurance.

29.     The Excess Policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance."

30.     The term "Underlying Insurance" for purposes of the Excess Policy is defined to include the Policy issued by Colony to BTE Management.

### THE *JEGLUM* ACTION

**A.     A Complaint is Filed Against BTE Management, B&T Engineering, and AT&T for Negligence in Connection With Catastrophic Personal Injuries Sustained by Jacobs' Employee Falling Off of the Cell Tower**

31.     On or about June 16, 2015, Thomas Jeglum, a former employee of Jacobs, filed an action in the Pennsylvania Court of Common Pleas, Philadelphia City, captioned *Thomas Jeglum v. AT&T, Inc., et al.* June Term 2015, No. 1527 (Pa. Ct. Common Pl., Phila. City) (the "*Jeglum* Action"). The *Jeglum* Action named AT&T, BTE Management, and B&T Engineering as defendants, along with the land owner Calvary Temple of Allentown. An amended complaint in the *Jeglum* Action was filed on November 16, 2016. A true and correct copy of the amended complaint in the *Jeglum* Action is attached hereto as Exhibit B.

32.     Mr. Jeglum asserted that on June 15, 2013, Jacobs allegedly dispatched a crew of employees, including Mr. Jeglum, to perform service and upgrade work on the Cell Tower to complete AT&T's service and upgrade requests. As Mr. Jeglum ascended the tower, the detachable rung on which Mr. Jeglum had been standing allegedly failed and/or slipped out of place. Mr. Jeglum allegedly fell approximately 50 feet from the Cell Tower and suffered severe and permanent traumatic injuries.

33.     The amended complaint in the *Jeglum* Action asserts claims for negligence against all of the defendants, including BTE Management and B&T Engineering.

34.     The amended complaint alleges that Jacobs hired BTE Management and BTE Engineering to provide inspection, evaluation, audit, design, and/or construction services on the Cell Tower from which Mr. Jeglum fell.  The amended complaint further alleges that BTE Management and BTE Engineering "inspected, evaluated, designed, constructed and/or managed the construction work" at the cell tower in question.

35.     The amended complaint asserts that all defendants, including BTE Management and BTE Engineering, breached their respective duties and were negligent in one or more of 28 different respects including, among other things: (i) failing to design, plan, manage, own, operate possess, inspect, evaluate, audit, construct, maintain, alter and/or control the Cell Tower and premises in a manner so as to eliminate known and obvious dangers to it; (ii) failing to discover, warn of, and/or repair other dangerous conditions on the Cell Tower; (iii) permitting or causing violations of the telecommunications industry association policies and standards, including ANSI/TIA 1019-A and ANSI/TIA 222-G.

**B.     ACE Agrees to Defend AT&T in Connection With the *Jeglum* Action and Colony Insurance Company Defends BTE Management and B&T Engineering**

36.     The Turf Agreement states that Jacobs shall "indemnity . . . and defend AT&T," including against "Loss that may be caused or alleged to be caused in part, by the negligence of AT&T."  Jacobs' insurer, ACE American Insurance Company ("ACE"), has agreed to undertake AT&T's defense and is defending AT&T in the *Jeglum* Action pursuant to Policy No. HDOG25529030 that ACE issued to Jacobs for the July 1, 2012 – July 1, 2013 policy period.

37.     Upon information and belief, Colony Insurance Company is defending BTE Management and B&T Engineering under the Policy in connection with the *Jeglum* Action.

C.     **Thomas Jeglum's Expert Witness Opines That BTE Breached the Applicable Standard of Care**

38.     Thomas Jeglum's expert witness, James Cohen, opined that the absence of a permanent safety climb system and the tower's removable rungs were preventable hazards. According to Mr. Cohen, BTE knew of these allegedly preventable hazards prior to Jeglum's fall, and BTE did not act reasonably in failing to correct these known hazards. Mr. Cohen opined further that BTE breached the applicable standard of care by failing to advise of the presence of removable rungs on the tower. Mr. Cohen opined that, while BTE may have noted in its report to AT&T that the cell phone tower did not have a safety cable, a notation alone is insufficient to satisfy the applicable standard of care.

39.     Mr. Cohen drew three primary conclusions to a reasonable degree of engineering certainty concerning BTE:

(i)     The absence of a permanent safety climb system at the Woodlawn Tower and the removability of the Woodlawn Tower's ladder rungs were preventable hazards. At least as of December 31, 2012, BTE Management and B&T Engineering knew of these preventable hazards, including the absence of a permanently installed safety climb system at and the removability of the ladder rungs that were not securely attached to the Woodlawn Tower.

(ii)     BTE Management and B&T Engineering failed to inspect and analyze the Woodlawn Tower and its appurtenances, including the climbing facility, in deviation of the standards of ANSI/TIA-222-G. BTE Management and B&T Engineering were required to report directly any unsafe conditions at the Woodlawn site to Jacobs, whose employees were to climb the tower, and AT&T, which owned the tower. Merely providing a tower mapping report with a notation that the Woodlawn Tower had no safety cable, while failing to advise of the existence of the

removability of the ladder rungs, was deficient and fell below the standard of care.

(iii)    BTE Management and B&T Engineering failed to directly notify and report the unsafe conditions and preventable hazards of the Woodlawn Tower to Jacobs or AT&T.  BTE Management and B&T Engineering also failed to recommend the remediation of the hazards to Jacobs and AT&T.  These failures fell below the standard of care and were in contravention of the policy of BTE Management and B&T Engineering to report unsafe conditions to Jacobs and AT&T.  The failure to directly notify and report the preventable hazards at the Woodlawn Tower and to recommend the remediation of those hazards was a cause of Thomas Jeglum's fall and his injuries.

**D.      Thomas Jeglum Defeats BTE Mangement's Motion for Summary Judgment**

40.      On June 5, 2017, BTE filed a twenty-five page motion for summary judgment, accompanied by a twenty-five page memorandum of law, as to Mr. Jeglum's cause of action for negligence.  First, BTE argued that, to establish a claim for negligence, a plaintiff must prove that the defendant owed a duty of care.  BTE argued that they owed no duty to Mr. Jeglum because they were not hired to perform a safety inspection and/or safety analysis at the Woodlawn Tower.  Second, BTE argued that, to prove causation, a plaintiff must demonstrate that any breach of duty was both the proximate cause and actual cause of injury.  BTE argued that Jacobs and AT&T both knew that the Woodlawn Tower lacked a permanent safety line and that the rungs were removable, and were both well aware of their potential safety ramifications, even without BTE informing them specifically of that.  Finally, BTE argued that neither Jacobs nor AT&T, despite possessing all of this information, did anything to remediate the allegedly unsafe conditions at the Woodlawn Tower.

41.      BTE's motion for summary judgment and accompanying memorandum of law cited extensively from the testimony provided in a number of depositions taken in the *Jeglum*

Action, including the deposition testimony of one of AT&T's corporate designees, Jimmy Coleman.

42.     On July 5, 2017, Mr. Jeglum filed his opposition to BTE's motion for summary judgment.  Mr. Jeglum argued that BTE's duty to report the preventable hazards at the Woodlawn Tower – the lack of permanent safety climb device and a ladder comprised of loose, removable rungs – arose from two independent sources: (1) the subcontractor agreements between BTE Management and Jacobs; and (2) the scope of the structural analysis work that BTE was retained to perform created a duty for the BTE defendants to identify and report hazardous conditions.  Mr. Jeglum argued that BTE breached both of these duties by failing to identify and directly report the Woodlawn Tower's hazards.  According to Mr. Jeglum, at no time prior to Mr. Jeglum's fall were the Woodlawn Tower's removable ladder rungs permanently or securely affixed, nor was the tower equipped with a permanent safety cable system.

43.     With respect to causation, Mr. Jeglum argued that the relevant question was whether, if Jacobs and AT&T had been informed directly by BTE of the alleged hazards at the Woodlawn Tower, the alleged hazards would have been remediated and the incident would have been avoided.  Mr. Jeglum argued that there is direct evidence on this point via the testimony of AT&T corporate designee Paul Condrack, who testified that AT&T uniformly granted the safety remediation recommendations of its telecommunications contractors.  Mr. Jeglum argued that, according to Mr. Condrack, AT&T automatically took measures to remediate safety hazards identified by its vendors.

44.     At the very least, Mr. Jeglum argued, there was evidence raising genuine issues of material fact as to the details of BTE's duties to report unsafe conditions, their beach of those duties, and causation.

45.     On August 10, 2017, the court in the *Jeglum* Action denied BTE's motion for summary judgment.

**E.    Jacobs Tenders the *Jeglum* Action to BTE Management for Indemnification and Coverage Under BTE Management's Commercial General Liability Insurance Policy**

46.    On June 28, 2017, Jacobs tendered the *Jeglum* Action to BTE Management for indemnification pursuant to the Subconsulting Agreement and also reminded BTE Management that it was obligated to obtain Commercial General Liability insurance naming Jacobs and AT&T as "additional insureds."  Jacobs requested that BTE Management notify the applicable insurance carrier(s) of the insured status of Jacobs and AT&T and their demands for coverage.  Jacobs also demanded copies of (i) all Certificates of Liability Insurance; (ii) all policies which may provide coverage to BTE and BTE's insurer(s) or other related entities for the incident involving Mr. Jeglum; and (iii) all correspondence between BTE and its insurance carrier(s) regarding the tender being made in the June 28, 2017 letter.  A true and correct copy of Jacobs' June 28, 2017 letter to BTE Management is attached hereto as Exhibit C.

47.    BTE Management has confirmed for Jacobs that once BTE Management received Jacobs' June 28, 2017 letter, BTE Management immediately sent a copy of that letter to Colony Insurance Company.

48.    On October 19, 2017, Jacobs sent additional correspondence to BTE Management re-iterating both its request that BTE's insurance carrier be put on notice and its request for BTE's insurance information.

### Colony's Wrongful Denial of Coverage as to Jacobs

49.    On November 9, 2017 – nearly four-and-a-half months after Jacobs tendered the *Jeglum* Action for coverage, and only two months before trial in the *Jeglum* Action is scheduled to commence – Colony Insurance Company denied coverage for Jacobs and AT&T under the Policy ("Denial Letter").  A true and correct copy of Colony Insurance Company's Denial Letter is attached hereto as Exhibit D.

50.    Colony Insurance Company's Denial Letter concludes that the Policy does not provide coverage to Jacobs or AT&T because Colony Insurance Company's "understanding" of the deposition testimony provided on March 7, 2017 by one of AT&T's designated

corporate representatives – Jimmy Coleman – "demonstrates that BTE's work did not cause and could not have caused, in whole or in part, the alleged injury to Mr. Jeglum." *See* Ex. D at p. 3.

51.     Specifically, Colony Insurance Company asserts:

> To summarize our understanding, according to its own corporate designee: (1) only AT&T was responsible for correcting unsafe conditions at the Cell Tower about which it knew; (2) AT&T was aware, at least as early as March 2009, that the Cell Tower did not have a permanent safety climb but nonetheless believed that the Cell Tower was safe; (3) BTE performed a structural analysis of the Cell Tower in 2012, to determine whether it could support new upgraded antennas and equipment that were being added to the tower; (4) BTE's structural analysis is different than a safety inspection or analysis, that it was not hired to perform; (5) AT&T knew or should have known in January 2013 – after BTE's structural analysis was completed – that the Cell Tower had ladder hoops only on one leg and no safety cable; and (6) despite AT&T's knowledge about these conditions at the Cell Tower, it did not correct any allegedly unsafe conditions at the Cell Tower prior to Mr. Jeglum's fall.  In short, AT&T own testimony demonstrates that BTE's work did not cause and could not have caused, in whole or in part, the alleged injury to Mr. Jeglum.

52.     Colony Insurance Company's reliance solely on its "understanding" of the deposition testimony of one person to deny coverage for Jacobs under the Policy contradicts settled, black-letter law regarding an insurance company's duty to defend.

53.     Courts universally recognize that an insurer is obligated to provide a defense as long as there is a potential for coverage under the policy.  Under Texas law, the duty to defend is determined according to the eight-corners rule wherein only the third-party pleadings and contractual language are considered, without regard to the truth or falsity of the allegations in the pleadings. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).  Extrinsic evidence that contradicts the plaintiff's allegations is not considered in deciding whether a duty to defend exists.  *Id.* at 310.  Moreover, the duty to defend is justiciable once the claim has been made without regard to the facts that may be ultimately decided at trial of the underlying case.  *Fireman's Ins. Co. v. Burch*, 442 S.W.2d 331, 332

(Tex. 1968); *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 371 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

54.     The amended complaint in the *Jeglum* action alleges that Jacobs hired BTE to "provide inspection, evaluation, audit, design, and/or construction services on the Cell Tower" from which Mr. Jeglum allegedly fell.  Mr. Jeglum further alleges that BTE "inspected, evaluated, designed, constructed and/or managed the construction work" at the cell tower in question, and that the negligence of BTE caused Mr. Jeglum to fall and suffer his injuries.

55.     Colony's denial of coverage is particularly unreasonable in light of the court in the *Jeglum* Action's ruling denying BTE's motion for summary judgment.  Given Mr. Jeglum's allegations and the denial of BTE's motion for summary judgment, there clearly exists a potential for coverage under the Policy.

56.     On November 17, 2017, Jacobs responded to Colony Insurance Company's Denial Letter.  Therein, Jacobs advised Colony Insurance Company that plaintiff in the *Jeglum* Action has agreed to mediate on December 5, 2017.  Jacobs demanded that Colony Insurance Company appear at the mediation with full authority to settle the case on behalf of its insureds. Jacobs also demanded that Colony Insurance Company provide Jacobs with a copy of the Policy.  Jacobs clarified that "[s]hould Colony Insurance Company refuse to mediate with Jacobs as demanded, Jacobs will initiate direct legal action against Colony Insurance Company for its bad faith in this matter and breaches of its duties and responsibilities generally described above."  Jacobs also stated that in the event it did not receive written acknowledgment from Colony Insurance Company by the close of business on November 20, 2017 that it will attend the mediation with full authority to settle the case, Jacobs would assume that Jacobs' demand was denied.

57.     Jacobs did not receive a response from Colony Insurance Company by the close of business on November 20, 2017.

58.     On November 20, 2017, Jacobs sent a letter to RSUI demanding that RSUI, as the excess insurer for Jacobs and AT&T above Colony, attend the December 5, 2017 mediation

represented by personnel with appropriate authority to settle the *Jeglum* Action for the full limits of the Excess Policy.

59.     Based on the foregoing, Jacobs brings this action against Colony as a result of Colony's failure to meet their policy obligations and Jacobs seeks a declaration regarding its rights under the Policy and Excess Policy.

## COUNT ONE

### (Breach of Contract - Colony)

60.     Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

61.     Colony issued the Policy to BTE for the policy period from March 13, 2013 to March 13, 2014, which provides coverage for those sums that the "insured" becomes legally obligated to pay because of "bodily injury" to which the insurance applies.  Subject to the terms and conditions contained therein, the Policy also provides a duty to defend.

62.     By virtue of the Subconsulting Agreement, BTE Management was obligated to add Jacobs and AT&T as "additional insureds" under the Policy.

63.     Upon information and belief, the Policy contains several endorsements that provide additional insured coverage to certain parties under certain circumstances.  First, Endorsement U649C-0111 [Contractors PAC] provides additional insured coverage to all persons or organizations as required by written contract with BTE Management.  Second, Endorsement Form CG 20 10 07 04 [Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization] provides additional insured coverage to all persons or organizations as required by written contract with the named insured.  Third, Endorsement Form U156C-0310 [Additional Insured – Owners, Lessees or Contractors – Scheduled Person or Organization] provides additional insured coverage to numerous named entities, including AT&T, under certain circumstances.  Fourth, Endorsement Form CG 20 37 07 04 [Additional Insured] provides additional insured coverage to AT&T for certain completed operations.

64.     Pursuant to these Endorsements, Jacobs and AT&T are "additional insureds" with respect to liability for "bodily injury" caused, in whole or in part, by BTE Management's acts or omissions in the performance of BTE Management's ongoing operations for Jacobs or AT&T.

65.     The amended complaint in the *Jeglum* Action alleges that BTE was hired by Jacobs to "provide inspection, evaluation, audit, design, and/or construction services on the Cell Tower" from which Mr. Jeglum allegedly fell.  Mr. Jeglum further alleges that BTE actually "inspected, evaluated, designed, constructed and/or managed the construction work" at the cell tower in question."  Moreover, Mr. Jeglum alleges that it was the negligence of BTE caused him to fall and suffer his injuries.

66.     The amended complaint asserts that all defendants, including BTE, breached their respective duties and were negligent in one or more of 28 different respects including, among other things: (i) failing to design, plan, manage, own, operate possess, inspect, evaluate, audit, construct, maintain, alter and/or control the Cell Tower and premises in a manner so as to eliminate known and obvious dangers to it; (ii) failing to discover, warn of, and/or repair other dangerous conditions on the Cell Tower; and (iii) permitting or causing violations of the telecommunications industry association policies and standards, including ANSI/TIA 1019-A and ANSI/TIA 222-G.

67.     The Turf Agreement states that Jacobs shall "indemnity . . . and defend AT&T," including against "Loss that may be caused or alleged to be caused in part, by the negligence of AT&T."  Jacobs' insurer, ACE American Insurance Company ("ACE"), has agreed to undertake AT&T's defense and is defending AT&T in the *Jeglum* Action pursuant to Policy No. HDOG25529030 that ACE issued to Jacobs for the July 1, 2012 – July 1, 2013 policy period.

68.     On June 28, 2017, Jacobs requested that BTE notify the applicable insurance carrier(s) of the insured status of Jacobs and AT&T under BTE Management's insurance policies and demanded coverage under such polices. *See* Ex. C.

69.     BTE has confirmed for Jacobs that once BTE received Jacobs' June 28, 2017 letter, BTE immediately sent a copy of that letter to Colony Insurance Company.

70.     On November 9, 2017, Colony Insurance Company denied coverage for Jacobs and AT&T under the Policy ("Denial Letter").

71.     Colony Insurance Company's Denial Letter concludes that the Policy does not provide coverage to Jacobs or AT&T because Colony Insurance Company's "understanding" of the deposition testimony provided on March 7, 2017 by one of AT&T's designated corporate representatives – Jimmy Coleman – "demonstrates that BTE's work did not cause and could not have caused, in whole or in part, the alleged injury to Mr. Jeglum." *See* Ex. D at p. 3.

72.     Courts universally recognize that an insurer is obligated to provide a defense as long as there is a potential for coverage under the policy.  In Texas, the duty to defend is determined according to the eight-corners rule wherein only the third-party pleadings and contractual language are considered, without regard to the truth or falsity of the allegations in the pleadings. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).  Extrinsic evidence that contradicts the plaintiff's allegations is not considered in deciding whether a duty to defend exists.  *Id.* at 310.  Moreover, the duty to defend is justiciable once the claim has been made without regard to the facts that may be ultimately decided at trial of the underlying case.  *Fireman's Ins. Co. v. Burch*, 442 S.W.2d 331, 332 (Tex. 1968); *English v. BGP Int'l, Inc.*, 174 S.W.3d 366, 371 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

73.     Colony Insurance Company is unquestionably obligated to defend Jacobs and AT&T in the *Jeglum* Action given that there clearly exists a potential for coverage under the Policy.

74.     Colony's failure to defend constitutes a breach of contract.

75.     As a result of Colony's breach of contract, Jacobs has incurred damages in an amount to be proven at trial, but in excess of the jurisdictional minimum of this Court.

## COUNT TWO

### (Declaratory Relief – Colony Insurance Company Has a Duty to Defend and Indemnify Jacobs and AT&T)

76.     Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

77.     Colony issued the Policy to BTE Management for the policy period from March 13, 2013 to March 13, 2014, which provides coverage for those sums that the "insured" becomes legally obligated to pay because of "bodily injury" to which the insurance applies. Subject to the terms and conditions contained therein, the Policy also provides a duty to defend.

78.     By virtue of the Subconsulting Agreement, BTE Management was obligated to add Jacobs and AT&T as "additional insureds" under the Policy.

79.     Jacobs and AT&T are "additional insureds" under the Policy with respect to liability for "bodily injury" caused, in whole or in part, by BTE Management's acts or omissions in the performance of BTE Management's ongoing operations for Jacobs or AT&T.

80.     The *Jeglum* Action alleges that the bodily injury sustained by Mr. Jeglum as a result of his fall from the Cell Tower was caused by the negligence of BTE.

81.     Accordingly, Jacobs is entitled to a judicial declaration that Colony Insurance Company is obligated to defend Jacobs and AT&T in connection with the *Jeglum* Action, and is obligated to indemnify Jacobs and AT&T for any judgment or settlement of the *Jeglum* Action.

82.     An actual controversy of a justiciable nature exists between Jacobs and Colony Insurance Company as to the rights and obligations of the parties under the Policy in relation to the *Jeglum* action.

## COUNT THREE

### (Declaratory Relief – RSUI Has a Duty to Defend and Indemnify Jacobs and AT&T Upon Exhaustion of Colony's Policy)

83.     Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

84.     Colony issued the Policy to BTE Management for the policy period from March 13, 2013 to March 13, 2014, which provides coverage for those sums that the "insured" becomes legally obligated to pay because of "bodily injury" to which the insurance applies. Subject to the terms and conditions contained therein, the Policy also provides a duty to defend.

85.     RSUI issued to the Excess Policy to BTE Management for the March 13, 2013 to March 13, 2014 policy period, which Excess Policy provides coverage for those sums that are incurred in excess of the limit of Colony's Policy.

86.     The Excess Policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance" (i.e., as the Colony Policy).

87.     Jacobs and AT&T are "additional insureds" under the Policy with respect to liability for "bodily injury" caused, in whole or in part, by BTE Management's acts or omissions in the performance of BTE Management's ongoing operations for Jacobs or AT&T.  As a result, Jacobs and AT&T also qualify as "additional insureds" to the same extent under the Excess Policy.

88.     Jacobs is entitled to a judicial declaration that upon exhaustion of Colony's Policy, RSUI will step in and defend Jacobs and AT&T under the Excess Policy in connection with the *Jeglum* Action, and has a duty to indemnify Jacobs and AT&T for any judgment or settlement of the *Jeglum* Action in excess of Colony's policy.

89.     An actual controversy of a justiciable nature exists between Jacobs and Colony Insurance Company as to the rights and obligations of the parties under the Policy in relation to the *Jeglum* action.

## COUNT FOUR

**(Colony Insurance Company Has Committed Unfair Settlement Practices in Violation of Texas Insurance Code Chapter 541)**

90.     Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

91.    Colony has violated Section 541.060 of the Texas Insurance Code as follows:

    a.    **Section 541.060(a)(2)(A):**  failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;

    b.    **Section 541.060(a)(3):**  failing to promptly provide a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim; and

    c.    **Section 541.060(a)(7):**  refusing to pay a claim without conducting a reasonable investigation with respect to the claim.

92.    As a result of Colony's conduct, Jacobs has suffered actual damages in an amount to be determined at trial.

## COUNT FIVE

**(Colony Insurance Company Has Violated the Texas Prompt Payment of Claims Statute Under Texas Insurance Code Chapter 542)**

93.    Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

94.    Colony has violated Section 542 of the Texas Insurance Code as follows:

    a.    **542.055**:  failing to timely acknowledge the *Jeglum* Action, commence an investigation of same, or request additional information within 15 days; and

    b.    **542.056**:  failing to accept, reject or request more information about the *Jeglum* Action within 15 business days and making no request for additional time.

95.    As a result of Colony's wrongful rejection of its defense obligation, Jacobs has suffered actual damages in an amount to be determined at trial.  The amount of loss Jacobs has suffered as a result of Colony's conduct includes, but is not limited to, the amount of all legal services Jacobs has incurred regarding the *Jeglum* Action.

96.     Because Jacobs' right to a defense benefit under the Policy constitutes a "first-party claim" within the meaning of the Texas Prompt Payment of Claims Statute, Accordingly, Colony Insurance Company's wrongful rejection of its defense obligation entitles Jacobs to all remedies available under the Texas Prompt Payment of Claims Statute, including but not limited to interest at the rate of eighteen percent a year, together with reasonable attorney's fees.  *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17-19 (2007); Tex. Ins. Code § 542.060(a).

## COUNT SIX
### (Common Law Bad Faith)

97.     Jacobs hereby refers to and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint.

98.     Colony's conduct, as described above, constitutes a breach of the common law duty of good faith and fair dealing owed by an insurer to its insured.  Colony's failure, as described above, to defend Jacobs and AT&T in the underlying *Jeglum* Action, even though Colony knew or should have known by the exercise of reasonable diligence that its liability was reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

99.     Moreover, Colony's conduct was malicious, intentional, fraudulent, or grossly negligent and Colony Insurance Company is liable for exemplary damages in connection with that conduct.

## JACOBS' JURY DEMAND

100.     Jacobs respectfully requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Jacobs prays for relief as follows:

(1)     Damages resulting from Colony's breach of contract;

(2)     A declaration that Colony is obligated to defend Jacobs in connection with the *Jeglum* Action;

(3)     A declaration that RSUI is obligated to defend Jacobs in connection with the *Jeglum* Action upon expiration of Colony's Policy;

(4)     Actual damages under Texas Insurance Code Section 541, plus additional damages in an amount three times the amount of actual damages owed by Colony Insurance Company, as provided in Section 541.152 of the Texas Insurance Code;

(5)     Actual damages under Texas Insurance Code Section 542, plus amounts that Colony should have paid under the Policy, interest on that amount at 18% per annum, plus attorneys' fees, as provided by Section 542.060 of the Texas Insurance Code;

(6)     Damages resulting from Colony's breach of the common law duty of good faith and fair dealing, including all forms of loss resulting from Colony's breach of duty, including but not limited to additional costs, losses due to nonpayment of the amount the insurer owed, and exemplary damages;

(7)     Reasonable attorneys' fees and costs of court; and

(8)     Such other and further relief as the Court may deem just and proper.

DATED November 22, 2017.

*Melanie McDonald*
Michael J. O'Connor, Esq. (CA SBN 90017)
(*pro hac vice* application forthcoming)
Melanie McDonald, Esq. (TX SBN 13555200)
Kelley Drye & Warren LLP
515 Post Oak Blvd., Ste 900
Houston TX 77027
(713) 355-5000; Fax (714) 355-5001
moconnor@kelleydrye.com
mmcdonald@kelleydrye.com

Attorneys for Plaintiff, JACOBS TELECOMMUNICATIONS, INC.