**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| JACOBS TELECOMMUNICATIONS, INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:17-cv-01112 (SS) |
| | : | |
| COLONY INSURANCE COMPANY | : | |
| and RSUI INDEMNITY COMPANY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**DEFENDANT COLONY INSURANCE COMPANY'S**
**MOTION TO DISMISS COMPLAINT, IN THE ALTERNATIVE FOR SUMMARY**
**JUDGMENT, AND BRIEF IN SUPPORT**

---

NOW COMES Colony Insurance Company and pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Colony Insurance Company files this its motion to dismiss Jacobs Telecommunications, Inc.'s Complaint for failure to state a claim, in the alternative, its motion for summary judgment dismissing plaintiff's case with prejudice and at plaintiff's costs.[1]

### I.     INTRODUCTION

In its 29-page Complaint (Dkt. 1) seeking additional insured coverage for itself and another entity under a Colony commercial general liability (CGL) insurance policy issued to non-party

---

[1] Under Rule 12(d), "[i]f, on a motion under Rule 12(b)(6) ... matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."

BTE Management Group, LLC, Jacobs fails to inform this Court of two critical facts: (1) that the Colony CGL policy contains an exclusion for professional services barring coverage for professional liability claims, and (2) that the underlying claim at issue is a professional liability claim because the allegations in the underlying action – on their own – make clear that BTE's alleged liability in that action arises out of its rendering or failure to render professional services. In its Complaint herein seeking additional insured coverage, Jacobs summarizes those allegations, as well as both the underlying plaintiff's expert testimony *and* his opposition to BTE's summary judgment motion, each of which further underscores the professional liability nature of the claim against BTE. Finally, the certificate of merit that the underlying plaintiff filed in the underlying action to avoid BTE's dismissal (a matter of public record about which this Court may take judicial notice for purposes of this motion) eliminates any doubt in that regard, because such a certificate is *only* filed for professional liability claims under the pertinent civil procedure rule.

The insurance provided by the Colony CGL policy provides no coverage for any bodily injury arising out of any professional liability claim, and because the allegations against BTE in the underlying action meet the professional services exclusion at issue, Colony asks that this Court dismiss the Jacobs Complaint as against Colony.

## II.   THE UNDISPUTED MATERIAL FACTS

### A.   The Jacobs Complaint

In this action, Jacobs seeks coverage as an additional insured in connection with an underlying action captioned *Thomas Jeglum v. New Cingular Wireless PCS, LLC et al.*, June Term 2015, No. 1527 (Pa. Ct. Common Pl., Phila. Cty.) (the "Underlying Action"), although Jacobs was never named as a defendant in that action.[2] According to Jacobs, the complaint in the Underlying

---

[2] A true and correct copy of the current docket sheet in the Underlying Action is attached as **Exhibit A** to this Motion to Dismiss. On a motion to dismiss, this Court may take judicial notice of the pleadings and

Action was initially filed on or about June 16, 2015, and an amended complaint was filed on November 16, 2016.[3] On June 28, 2017, after BTE and the other defendants had already filed summary judgment motions in the Underlying Action,[4] and over two years after the Underlying Action was filed, Jacobs initially tendered the claim to BTE and Colony, on behalf of itself and non-party AT&T.[5]

Specifically, Jacobs seeks defense and indemnity for itself and for non-party AT&T in the Underlying Action, as additional insureds under Colony CGL Policy No. GL900976 issued to BTE for the policy period of March 13, 2013 to March 13, 2014 (the "Colony Policy").[6] Jacobs contends that it and AT&T are entitled to be "additional insureds" under the Colony Policy, by virtue of a Subconsulting Agreement between BTE and Jacobs, under which BTE agreed to procure such coverage for Jacobs and AT&T.[7] Jacobs cites four separate additional insured endorsements to the Colony Policy under which Jacobs contends that AT&T and/or Jacobs are entitled to coverage.[8]

While Colony disputes Jacobs' and AT&T's entitlement to additional insured coverage under the cited endorsements, and while such dispute is not amenable to disposition on a motion

---

docket sheet in a state court matter, because they are "matters of public record." *See, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011), *citing Norris v. Heart Trust*, 500 F.3d 454, 461 n.8 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record").

[3] *See* Jacobs Complaint, ¶ 31. Jacobs attached a copy of the operative amended complaint (the "Underlying Complaint") as Exhibit B to its Complaint in this action. For the Court's convenience, the Underlying Complaint is also attached as **Exhibit B** to this Motion to Dismiss. To avoid confusion, reference to Exhibits attached to this Motion to Dismiss will be **bolded**.

[4] *See* Jacobs Complaint, ¶ 40. *See also* **Exhibit A** (June 5, 2017 entries).

[5] *See* Jacobs Complaint, ¶ 46 & Exhibit C thereto.

[6] A true and correct copy of the Colony Policy, upon which Jacobs relies in its Complaint (*see* Jacobs Complaint, ¶¶ 19-26), is attached as **Exhibit C** to this Motion to Dismiss. *See Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) ("court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim'").

[7] *See* Jacobs Complaint, ¶¶ 9-14 & 62.

[8] *See* Jacobs Complaint, ¶¶ 23-26.

to dismiss, there is a much more straightforward reason that *can be resolved* on a motion to dismiss, as a matter of law, based on the allegations in the Jacobs Complaint. As outlined below, the Colony Policy excludes coverage for bodily injury arising from BTE's failure to properly render a "professional service," and the plaintiff in the Underlying Action alleges that his injuries arose from BTE's failure to properly perform its professional service. Thus, because the Colony Policy excludes coverage for the professional liability claim against BTE, it provides no additional insured coverage to Jacobs or AT&T.

**B.      The Underlying Action**

In its Complaint in this Court, Jacobs summarizes *not only* the allegations in the Underlying Complaint, *but also* the underlying plaintiff's expert's testimony in that action *and* his opposition brief that successfully defeated BTE's summary judgment motion.

**1.      Summary of the Allegations in the Underlying Complaint**

The plaintiff in the Underlying Action, Thomas Jeglum, alleges that he was employed by Jacobs and working as a cell tower technician, when he was injured on June 15, 2013.[9] Specifically, Mr. Jeglum alleges that he was injured when he was sent to perform service and upgrade work on a cell tower, and he fell approximately 50 feet when the detachable rung on which he was standing failed and/or slipped out of place.[10] Mr. Jeglum contends that the defendants were negligent because they failed to install a permanent-rung ladder, safety cage and/or guard rail, and permanent safety cable or vertical lifeline system on the Cell Tower.[11] Mr. Jeglum sued AT&T,[12] BTE

---

[9]  *See* Jacobs Complaint, ¶¶ 31-32; **Exhibit B**, ¶¶ 28-30, 44.

[10]  *See* Jacobs Complaint, ¶ 32; **Exhibit B**, ¶¶ 44-50.

[11]  *See* **Exhibit B**, ¶¶ 60 a.-c.

[12]  The Underlying Complaint also names New Cingular Wireless PCS, LLC as a defendant, and refers to New Cingular and AT&T Mobility LLC together as "AT&T." *See* **Exhibit B**, ¶ 12. According to the Jacobs Complaint, its insurer, ACE American Insurance Company, has been defending AT&T in the Underlying

Management, and B&T Engineering as defendants, as well as land owner Calvary Temple of Allentown, but he did not sue his employer, Jacobs.[13]

Specifically with regard to BTE, Mr. Jeglum alleges that in or around 2012, AT&T and/or Jacobs hired BTE to "provide *inspection*, *evaluation*, *audit*, *design*, and/or construction services on the Cell Tower."[14] He further alleges that BTE "*evaluated*, *inspected*, *audited*, *designed* and/or constructed the Cell Tower, and *provided design* and construction *services* on the Cell Tower in or about approximately 2012."[15] As summarized by Jacobs in its Complaint here, Mr. Jeglum asserts that BTE was negligent in:

(i)    failing to *design*, plan, manage, own, operate, possess, *inspect*, *evaluate*, *audit*, construct, maintain and/or control the Cell Tower and premises in a manner so as *to eliminate known and obvious dangers to it*;

(ii)   *failing to discover, warn of,* and/or repair *other dangerous conditions* on the Cell Tower; and

(iii)  permitting or causing *violations of the telecommunications industry association policies and standards*, *including ANSI/TIA 1019-A and ANSI/TIA 222-G*.[16]

Each of these alleged deficiencies reflect alleged failure to properly render professional services.

### 2.    Mr. Jeglum's Expert Witness Testimony

In its Complaint in this action, Jacobs goes beyond the Underlying Complaint, and describes and relies upon the testimony of Mr. Jeglum's expert in the Underlying Action, who opined that (1) the absence of a permanent safety climb system and the tower's removable rungs

---

Action, presumably because Jacobs procured additional insured coverage for AT&T under its own liability insurance. *See* Jacobs Complaint, ¶ 36.

[13]  *See* Jacobs Complaint, ¶ 31; **Exhibit B**, ¶¶ 2-25.

[14]  *See* Jacobs Complaint, ¶ 34; **Exhibit B**, ¶ 40 (emphasis added).

[15]  *See* Jacobs Complaint, ¶ 34 (emphases added); **Exhibit B**, ¶ 32.

[16]  *See* Jacobs Complaint, ¶ 35 (emphases added); **Exhibit B**, ¶¶ 60 i., s., x.

were preventable hazards; and (2) BTE knew of these allegedly preventable hazards and did not

act reasonably.[17] Jacobs also summarizes that expert's "three primary conclusions *to a reasonable*

*degree of engineering certainty concerning BTE*":

(i)     The absence of a permanent safety climb system at the Woodlawn Tower and the removability of the Woodlawn Tower's ladder rungs were preventable hazards. *At least as of December 31, 2012, BTE Management and B&T Engineering knew of these preventable hazards*, including the absence of a permanently installed safety climb system at and the removability of the ladder rungs that were not securely attached to the Woodlawn Tower.

(ii)    BTE Management and B&T Engineering *failed to inspect and analyze* the Woodlawn Tower and its appurtenances, including the climbing facility, *in deviation of the standards of ANSI/TIA-222-G*. BTE Management and B&T Engineering *were required to report directly any unsafe conditions at the Woodlawn site to Jacobs*, whose employees were to climb the tower, and AT&T, which owned the tower. *Merely providing a tower mapping report with a notation* that the Woodlawn Tower had no safety cable, while failing to advise of the existence of the removability of the ladder rungs, *was deficient and fell below the standard of care*.

(iii)   BTE Management and B&T Engineering *failed to directly notify and report the unsafe conditions and preventable hazards* of the Woodlawn Tower to Jacobs or AT&T. BTE Management and B&T Engineering also *failed to recommend the remediation of the hazards* to Jacobs and AT&T. *These failures fell below the standard of care and were in contravention of the policy of BTE Management and B&T Engineering to report unsafe conditions* to Jacobs and AT&T. The failure to directly notify and report the preventable hazards at the Woodlawn Tower and to recommend the remediation of those hazards was a cause of Thomas Jeglum's fall and his injuries.[18]

Each of these alleged deficiencies, opined upon "to a reasonable degree of engineering certainty"

likewise reflects BTE's alleged failure to properly render professional services.

---

[17] *See* Jacobs Complaint, ¶ 38.
[18] *See* Jacobs Complaint, ¶ 39 (emphases added).

### 3.      Mr. Jeglum's Opposition to BTE's Summary Judgment Motion

Also in its Complaint in this action, Jacobs describes and relies upon Mr. Jeglum's

successful opposition to BTE's summary judgment motion.[19] According to Jacobs, Mr. Jeglum

argues that BTE's duty to report the allegedly preventable hazards arose from two independent

sources: (1) the subcontractor agreements between BTE and Jacobs; and (2) the scope of the

structural analysis work that BTE was retained to perform.[20] In his summary judgment opposition,

(incorporated into Jacobs' Complaint in this action), Mr. Jeglum details those two alleged sources

of BTE's duty to report preventable hazards. First, Mr. Jeglum describes the nature of the

professional services that BTE contracted to perform at the Cell Tower:

> In December 2012, Jacobs contracted Defendant BTE Management
> *to perform construction drawings and engineering services,*
> *including a structural analysis and geotechnical analysis of the*
> *Woodlawn Tower*. Defendant BTE Management then verbally
> subcontracted with a related entity, B&T Engineering, whose field
> technician, Patrick Jewel, went to the Woodlawn site, *investigated*
> *it, and submitted construction drawings* for the tower, *along with*
> *an inspection report*.[21]

Second, Mr. Jeglum describes the technical and highly specialized scope of the structural analysis

work that BTE was retained to perform:

> BTE Management and B&T Engineering as the *engineering firms*
> *tasked with the structural analysis* of the Woodlawn Tower, were
> *required per Section 15.5.2, Rigorous Structural Analysis, of*
> *ANSI/TIA-222-G* to perform an investigation, analysis, and

---

[19] *See* Jacobs Complaint, ¶¶ 40-45.

[20] *See* Jacobs Complaint, ¶ 42. Because Jacobs relies upon and summarizes Mr. Jeglum's summary judgment opposition in its Complaint (*see id.* ¶¶ 42-45), a true and correct copy of that opposition is attached as **Exhibit D** to this Motion to Dismiss. This Court may consider Mr. Jeglum's opposition both because Jacobs relies upon it in its Complaint, and because it is a matter of public record. *See e.g., Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) ("court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim'"); *Norris v. Heart Trust*, 500 F.3d at 461 n.8 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record").

[21] *See* **Exhibit D**, at 8 (emphases added).

potential upgrade of the Woodlawn Tower to accommodate new antenna equipment. Safety should be an integral part of any *engineering design or analysis*. One of the primary duties of an engineer is to ensure the safety of the individuals who will be affected by the work that they design or analyze. *The Code of Ethics of the National Society of Professional Engineers* makes clear that the safety, health, and welfare of the public is of paramount importance of the engineer. Furthermore, in performing their duties, civil engineers should avoid endangering the health and safety of construction workers, operators of the projects and the general public....

BTE Management and B&T Engineering should have also provided work in support of tower appurtenances, including the climbing facility. *ANSI/TIA-222-G Section 14.0 and Annex J, Maintenance and Condition Assessment, required* that for field mapping of structures and appurtenances, a condition assessment should be performed as to the structural condition of the structure. *Per Annex J of the TIA-222-G standard*, the structural condition assessment included an assessment of "Loose Members" and assessment of "climbing facilities" to ensure they were "all secure." By definition, a climbing facility is a structural appurtenance and should be inspected and assessed as part of the Annex J normative condition assessment.[22]

Each of these alleged independent sources for BTE's alleged duty to report preventable hazards likewise painstakingly reflects the highly specialized nature of the professional services that BTE allegedly failed to properly render.

### 4.    The Certificates of Merit in the Underlying Action

After BTE was served with the Underlying Complaint, it filed a Notice of Intent to Enter Judgment of Non Pros for Failure to File Certificate of Merit, which could lead to the dismissal (under Pennsylvania procedural law) if the plaintiff fails to file a Certificate of Merit within thirty days.[23] In response to BTE's Notice, on August 7, 2015, Mr. Jeglum filed a Certificate of Merit in the Underlying Action, in which Mr. Jeglum's counsel certifies as follows:

---

[22] *See* **Exhibit D**, at 17-18 (emphases added).

[23] *See* **Exhibit A** (July 24, 2015, entry).

> ***An appropriate licensed professional*** has supplied a written statement to the undersigned that there is a reasonable probability that ***the skill and/or knowledge exercised or exhibited by this defendant*** in the work that is the subject of the Complaint, ***including the inspection, evaluation, audit, design, construction, and/or modification***, ***fell outside acceptable professional standards*** and that such conduct was a cause in bringing about the harm to Plaintiff.[24]

Thus, the filing of the Certificate of Merit reflects the underlying plaintiff's (as well as BTE's) understanding that the claim against BTE is a professional liability claim.

## C.   The Colony Policy

The Colony Policy provides CGL coverage to non-party BTE, and it excludes coverage for professional liability claims like the claim against BTE in the Underlying Action. Specifically, the Colony Policy adds the following Professional Services Exclusion to the Policy's exclusion:

**MISCELLANEOUS EXCLUSIONS ENDORSEMENT**

* * *

**B.  SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, 2. Exclusions** are amended and the following are added:

* * *

**EXCLUSION – PROFESSIONAL SERVICES**

This insurance does not apply to "bodily injury" ... arising directly or indirectly out of the rendering or failure to render any "professional service" except by endorsement to this policy and then only to the extent of such endorsement.

"Professional service" means:

* * *

(2)   ***preparing***, ***approving***, or failing to prepare or approve ***maps***, ***drawings***, ***opinions***, ***reports***, ***surveys***, change orders, ***designs*** or specifications;

(3)   ***engineering services***, including related supervisory or ***inspection*** services; ...

---

[24]  A true and correct copy of the Certificate of Merit as to Defendant B+T Group (a/k/a BTE Management Group, LLC) is attached as **Exhibit E**.

*See* Exhibit C, Form U004-0510 (emphases added). The Colony Policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[25] Thus, when a lawsuit or claim seeks damages for bodily injury that allegedly arises directly or indirectly out of the rendering or failure to render ***any*** "professional service," there is no duty to defend. Because the negligence claim in the Underlying Action is a "professional services" claim, there is no coverage – and no additional insured coverage – for the Underlying Action under the Colony Policy.

## III.   LEGAL ARGUMENT

### A.   Standards for Deciding a Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Review is limited to the contents of the complaint and matters properly subject to judicial notice. *See Chartis Specialty Ins. Co. v. Tesoro Corp.*, 930 F. Supp. 2d 653, 660 (W.D. Tex. 2013). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (court may examine matters of which a court may take judicial notice) (citing 5B Wright & Miller § 1357 (3d ed. 2004 & Supp. 2007). Thus, in addition to the Jacobs Complaint, this Court may take judicial notice of the docket and Certificate of Merit filed in the Underlying Action. Additionally, a court resolving a motion to dismiss may also consider documents attached to a motion to dismiss that "are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *See Sullivan*, 600 F.3d at 546. Thus, this Court may consider the underlying plaintiff's opposition to BTE's summary judgment motion, which is referenced by and relied upon by Jacobs in its Complaint. In the alternative, Colony moves for consideration of the motion as one made under Rule 56.

---

[25] See id., Form CG 00 01 12 07, § V.3.

**B.      Texas Choice-Of-Law Rules Dictate That Oklahoma
        Law Controls This Insurance Coverage Dispute.**

Jacobs filed this insurance coverage lawsuit in Texas,[26] despite the fact that: (1) none of

the parties to this lawsuit are Texas corporations nor are their principal places of business alleged

to be in Texas; (2) the underlying tort action was filed in Pennsylvania, concerning an accident

that took place in Pennsylvania; and (3) the absent party to this action – the named insured, BTE

– is an Oklahoma corporation with an Oklahoma principal place of business.[27] Because Texas and

Oklahoma law differ on what the Court may consider in evaluating whether an insurer has a duty

to defend,[28] a choice-of-law analysis must be performed.

As demonstrated below, under Texas choice-of law rules, Oklahoma law applies to this

coverage dispute, because this action seeks the interpretation of insurance policies issued to an

Oklahoma insured in Oklahoma, that insures risks nationwide. *See St. Paul Fire & Marine Ins.

Co. v. Giganews, Inc.*, 193 F. Supp. 3d 745, 751 n.6 (W.D. Tex. 2016) (applying Texas choice-of-

law rules, which compare the relationships between the instant dispute and each state, to determine

that insurance coverage dispute is more closely related to Texas than California, where "the

---

[26] Presumably, Jacobs would try to justify its forum choice on the basis that its February 8, 2012, Indefinite Delivery Subconsulting Agreement with the absent party, BTE, states that said agreement is governed by Texas law. **First**, none of the parties to this action have any connection to this forum. **Second**, and more importantly, this insurance coverage action involves the interpretation of ***BTE's two insurance policies***, and ***not*** any agreements between Jacobs and BTE. **Third**, of note, but irrelevant to this insurance coverage dispute, Jacobs references a second Jacobs-BTE agreement, dated December 2, 2011 (*see* Jacobs Complaint ¶ 8), but fails to attach that agreement as an exhibit, perhaps because that agreement is governed by New Jersey law.

[27] *See* Jacobs Complaint ¶¶ 2-4, 31 & Exhibit B thereto at ¶ 15.

[28] Texas courts adhere to an "eight corners" duty to defend analysis, confining review to only two documents: the policy and the pleadings of the third-party claimant; facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination. *See GuideOne Elite v. Fielder Rd. Baptist Church*, 197 SW 3d 305, 308 (Tex. 2006) (finding that lower court erred in considering extrinsic evidence to defeat the insurer's duty to defend). By contrast, Oklahoma courts determine an insurer's defense duty "on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded (or tendered)." *See First Bank of Turley v. Fid. & Dep. Ins. Co.*, 928 P.2d 298, 303-04 (Okla. 1996).

Underlying Suit was filed in California, [but] the Policy — which consists of Texas forms — was issued through a Texas agent to Texas insureds, and insures risks nationwide"). *See also Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.2d 337, 344 (Tex. App.-Houston [14th Dist.] 2004, *pet. denied*).

Where, as here, an insurance policy does not contain a choice-of-law provision, Texas courts engage in an analysis to determine which state has the "most significant relationship" to the substantive issue presented for determination, examining the considerations enumerated in Section 6 of the Restatement (Second) Conflicts of Law.[29] "[W]hen the issues of a case require the construction and application of insurance policies ... the relevant inquiry is what contacts the state has with the insurance dispute, and not with the underlying lawsuit." *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir. 1996). Specifically, courts applying Texas choice-of-law rules to an insurance coverage dispute involving a determination of whether an insurer has a duty to defend or indemnify have found that where insurance policies (as here) "provide nationwide liability coverage, [then] the place of contracting, the place of negotiation, and the domicile, residence, nationality, place of incorporation, and place of business of the parties become the primary factors to determine which law applies." *See Reddy Ice*, 145 S.W.3d at 346.

Applying these factors, it is plain that Oklahoma law governs: The Colony Policy provides nationwide liability coverage to BTE; the Colony Policy was issued and delivered to BTE in

---

[29] Those general considerations are: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of result; and (7) ease in the determination and application of the law to be applied. *See Reddy Ice*, 145 S.W.3d at 344. Further, the relevant factors specific to contract disputes include: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See Reddy Ice*, 145 S.W.2d at 344; *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-36 (Tex. 1997); Restatement (Second) Conflict of Laws § 188(2).

Oklahoma;[30] and BTE is an Oklahoma corporation with its principal place of business in Oklahoma,[31] so Oklahoma is its domicile, residence, place of incorporation, and place of business. The only potential connection with Texas is that the insurance broker/agent is located in Texas.[32] However, other states analyzing the "most significant relationship" test applied by Texas courts have greatly discounted the importance of the broker's location, where, as here, "none of the parties were residents of that forum, the injuries occurred elsewhere, and the policy covered multiple risks in multiple locations."[33]

Moreover, that the Colony Policy contains only one state-specific endorsement – an *Oklahoma Changes – Cancellation and Nonrenewal* endorsement, modifying the Colony Policy to track *Oklahoma law* regarding cancellation and nonrenewal[34] – evidences that the parties to the policy expected Oklahoma law to apply to any disputes involving the policy. *See, e.g., Giganews*, 193 F. Supp. 3d at 751 n.6 (finding choice-of-law significance in fact that the insurance policy at issue included Texas forms).[35]

As the Court found in *Klein v. Federal Insurance Co.*, 220 F. Supp. 3d 747 (N.D. Tex. 2016), where, like here, all of the relevant insurance policy contacts were in another state (there,

---

[30] *See* **Exhibit C**, Form DCJ6550 (07/02) (Common Policy Declarations).

[31] BTE admitted in its answer in the Underlying Action that it is a business entity organized under the laws of Oklahoma and that its principal place of business is in Oklahoma. *See* **Exhibit B**, ¶ 15; BTE Answer to Underlying Complaint (true and correct copy attached as **Exhibit F**), ¶ 15.

[32] *See* **Exhibit C**, Form DCJ6550 (07/02) (Common Policy Declarations).

[33] *See, e.g., Pinnacle Realty Mgmt. Co. v. National Union Fire Ins. Co.*, 2007 WL 1970275 at *3 (D. Colo. July 3, 2007) ("I do not consider the location of the brokers to be more important than that of the parties"), *quoting Canron, Inc. v. Federal Ins. Co.*, 918 P.2d 937, 944 (Wash. App. 1996).

[34] *See* **Exhibit C**, Form UIL0236-0702 (Oklahoma Changes – Cancellation and Nonrenewal).

[35] *See also Pinnacle Realty*, at *4 (applying Washington law where insurance policy contained only one state-specific endorsement, a Washington Amendatory Endorsement regarding cancellation); *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1206 (S.D. Cal. 2007) (applying Connecticut law where insurance policy contained only one state amendatory endorsement, a Connecticut Changes – Cancellation and Nonrenewal).

Ohio), that other state's law should be applied to the insurance coverage dispute, because, *inter alia*, "there is no suggestion anywhere in the summary judgment record that any party to the Federal Policy would have expected Texas law to govern questions regarding coverage." *Id.* at 769. Likewise, here, no party to the Colony Policy would have expected Texas law to apply, and the Court should apply Oklahoma law to this insurance coverage dispute.

C.       **Under Oklahoma Law, There is No Duty to Defend Jacobs or AT&T**

As noted above, Oklahoma courts determine an insurer's defense duty "on the basis of information gleaned from the petition *(and other pleadings)*, from the insured and from other sources available to the insurer at the time the defense is demanded (or tendered)." *See First Bank of Turley v. Fid. & Dep. Ins. Co.*, 928 P.2d 298, 303-04 (Okla. 1996) (emphasis added). *See also Mount Vernon Fire Ins. Co. v. Okmulgee Inn Venture, LLC*, 451 Fed. Appx. 745, 748 (10th Cir. 2011) (citing *Turley* for the proposition that under Oklahoma law "the analysis is not restricted to the four corners of the complaint" when determining whether an insurer has a duty to defend). The Court may consider other pleadings in the Underlying Action when considering whether the Colony Policy provides a duty to defend, including other materials relied upon by Jacobs in its Complaint in this action, and the Certificate of Merit.

1.       **Based On The Allegations Of The Underlying Complaint And Other Pleadings Relied Upon, The Colony Policy Precludes Coverage For Bodily Injury Arising Out Of The Professional Services That BTE Rendered or Failed to Render**

The crux of Mr. Jeglum's claim against BTE is that BTE had a duty to report preventable hazards that it learned about during the course of performing its work.[36] The Colony CGL Policy contains a "professional service" exclusion, precluding coverage for bodily injury "*arising directly*

---

[36]   *See, e.g.,* **Exhibit B**, ¶¶ 60 r.-t.; **Exhibit D** (Jeglum's Opposition to SJ Motion), at 1 (BTE breached its duties by "failing to identify and directly report the tower's hazards").

*or indirectly out of* the rendering or failure to render *any* 'professional service.'" The exclusion

defines "professional service," in pertinent part, as:

> (2)   ***preparing***, ***approving***, or failing to prepare or approve ***maps***, ***drawings***, ***opinions***, ***reports***, ***surveys***, change orders, ***designs*** or specifications;
>
> (3)   ***engineering services***, including related supervisory or ***inspection*** services; …[37]

The first question is the level of causation the rendering of "professional services" and the injury,

and as explained below, Oklahoma courts view "arising out of" broadly, and interpret it as

requiring only some causal connection.

### a.   "Arising out of" is interpreted broadly under Oklahoma law

While the professional services exclusion requires some causal connection between the

insured's rendering or failure to render professional services and the claimed injury, proximate

causation is not required. Rather, Oklahoma courts follow the "general consensus," interpreting

the phrase "***arising out of***" as having a broad reading, such as "originating from" or "growing out

of" or "flowing from" or "done in connection with" — "that is, it requires some causal connection

to the injuries suffered, but does not require proximate cause in the legal sense." *See Federal Ins.*

*Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998) (interpreting Oklahoma law). The *Tri-*

*State* Court also refused to give the phrase a more restrictive meaning if it appears in an

exclusionary clause. *Id.* at 805 ("Because we do not believe that we can make a principled

distinction in meaning simply based upon where in the contract the phrase 'arising out of' appears,

we decline to assign it a more restrictive meaning simply because it appears in the context of an

exclusionary clause"). *See also State Farm Fire & Cas. Co. v. Pettigrew*, 180 F. Supp. 3d 925, 936

---

[37]   *See* **Exhibit C**, Form U004-0510 (emphases added). Because the Colony Policy defines "professional service," this Court does not need to examine those cases divining the definition from other case law. *See, e.g., State Farm Fire & Cas. Co. v. Pettigrew,* 180 F. Supp. 3d 925, 935 (N.D. Okla. 2016) (examining cases defining "professional services" in the absence of a definition in the insurance policy at issue there).

(N.D. Okla. 2016) (Oklahoma courts "afford 'arising out of' a broad reading to include anything that 'originates from,' 'grows out of,' 'flows from' or is 'done in connection with' the professional services rendered"; finding no coverage under a professional services exclusion).

### b. The two alleged sources of BTE's duty to report both meet the definition of "professional services"

In the Underlying Action, Mr. Jeglum alleges that BTE's duty to report preventable hazards arises from two sources, both of which fit "hand in glove" with the Colony Policy's definition of "professional services", namely, (1) the ***subcontractor agreements*** between BTE and Jacobs; and (2) the ***standards for an engineering firm*** performing a Rigorous Structural Analysis.[38]

The Colony Policy defines "professional service," in part, as "***engineering services***, including related supervisory or ***inspection*** services."[39] Taking the second alleged source first, BTE's alleged failure to meet the "standards for an engineering firm" clearly meets that definition of "professional service" in the Colony Policy, because: (1) Mr. Jeglum identifies BTE's work as ***engineering services***:[40] and (2) he alleges that BTE failed to meet the "***standards for an engineering firm***," specifying certain engineering standards that BTE was required, but allegedly failed, to meet in its work (*e.g.*, ANSI/TIA-222-G).[41] Moreover, according to the Jacobs Complaint, Mr. Jeglum's expert "drew three primary conclusions ***to a reasonable degree of engineering certainty*** concerning BTE."[42] Thus, the second alleged "source" of BTE's duty to

---

[38] *See* Jacobs Complaint, ¶ 42; **Exhibit D** (Jeglum's Opposition to SJ Motion), at 1.

[39] *See* **Exhibit C**, Form U004-0510, Definition (3) (emphases added).

[40] *See* **Exhibit D**, at 1 & 17 (referring to BTE "as the engineering firm tasked with the structural analysis of the Woodlawn Tower").

[41] *See* **Exhibit D**, at 16-18 (discussing particular engineering and civil engineering standards that BTE, as the engineering firm, should have met).

[42] *See* Jacobs Complaint, ¶ 39.

report meets the definition of "professional service," and BTE's liability in that regard would indisputably "arise out of" its engineering services work.

The first alleged source – the subcontractor agreements between BTE and Jacobs – also fall squarely within the Colony Policy's definition of "professional service." Mr. Jeglum alleges that Jacobs hired BTE to provide "*inspection, evaluation, audit, design*, and/or construction[43] services" on the Cell Tower, and that BTE "*inspected, evaluated, audited, designed*, and/or constructed" the Cell Tower.[44] Likewise, in his opposition to BTE's summary judgment motion, Mr. Jeglum more specifically alleges that Jacobs contracted with BTE to "perform construction *drawings* and *engineering services*, including a structural analysis and geotechnical analysis" of the cell tower, and that BTE "submitted *construction drawings* for the tower, along with a *field inspection report*."[45] Thus, the work that BTE allegedly contracted to perform and did perform for Jacobs dovetails precisely with the Colony Policy's definition of "professional service":

(2)     *preparing*, *approving*, or failing to prepare or approve *maps*, *drawings*, *opinions*, *reports*, *surveys*, change orders, *designs* or specifications;

(3)     *engineering services*, including related supervisory or *inspection* services; …[46]

Thus, because the first alleged "source" of BTE's duty to report also meets the definition of "professional service," BTE's liability in that regard would indisputably "arise out of" its work under its subcontracts with Jacobs.

---

[43] Notably, to the extent that BTE is alleged to have performed *construction* services for Jacobs and AT&T, then Oklahoma's anti-indemnity statute – 15 OKLA. ST. ANN. § 221 – would preclude coverage for any putative additional insureds under the Colony Policy. *See BITCO Gen. Ins. Corp. v. Commerce & Industry Ins. Co.*, 2017 WL 835197, at *3 (W.D. Okla. Mar. 2, 2017) (Oklahoma anti-indemnity statute prohibits additional insured coverage and any duty to defend).

[44] *See* Jacobs Complaint, ¶¶ 34-35 (emphases added); **Exhibit B**, ¶¶ 32, 34.

[45] *See* **Exhibit D**, at 8 (emphases added).

[46] *See* **Exhibit C**, Form U004-0510 (emphases added).

**c. The Certificate of Merit filed by Mr. Jeglum underscores that BTE's alleged liability arises out of its professional services**

In addition to all of the foregoing, the Certificate of Merit – a matter of public record of which this Court may take judicial notice – that Mr. Jeglum submitted to the Court as to BTE makes clear that *only* BTE's rendering, or alleged failure to render, professional services are at issue in the Underlying Action. In the Certificate of Merit, Mr. Jeglum's counsel certifies that "[a]n *appropriate licensed professional*" provided a statement that there is a "reasonable probability" that "*the skill and/or knowledge exercised or exhibited*" by BTE caused the plaintiff's harm.[47]

Under the Pennsylvania Rules of Civil Procedure, a Certificate of Merit must be filed by the attorney for the plaintiff "[i]n any action based upon an allegation that a licensed professional deviated from an acceptable professional standard." PA. R. CIV. P. 1042.3; *see also McElwee Group, LLC v. Municipal Auth.*, 472 F. Supp. 2d 472, 475 (E.D. Pa. 2007) ("Merely suing a professional does not require a certificate of merit; *only suing a professional for violating professional standards does*"). Thus, the filing of the Certificate of Merit reflects the underlying plaintiff's understanding that his claim against BTE is a professional liability claim.[48]

Based on the Jacobs Complaint – which summarized not only the allegations in the Underlying Complaint, but also the underlying plaintiff's expert testimony and summary judgment opposition – BTE's alleged liability arises "directly or indirectly out of its rendering or failure to render professional services." The underlying plaintiff's Certificate of Merit underscores the fact.

---

[47] *See* **Exhibit E.**

[48] Indeed, BTE filed a Notice of Intent in the Underlying Action, that could lead to dismissal if the plaintiff fails to file a Certificate of Merit within thirty days with respect to a professional liability claim, and plaintiff filed his Certificate of Merit fourteen days later. *See* **Exhibit A** (July 24, 2015, and August 7, 2015, entries). Thus, BTE's filing of a Rule 1042.6 Notice of Intent, and Mr. Jeglum's subsequent filing of a Certificate of Merit as to BTE, each serve to further demonstrate that both BTE and the plaintiff well understood that Mr. Jeglum's claim against BTE is a professional liability claim, that arises out of his professional services.

### 2. The Court May Dismiss The Jacobs Complaint As Against Colony On A Motion To Dismiss

As described above, Oklahoma courts recognize that "the insurer's defense duty is determined **on the basis of information** gleaned **from the petition (and other pleadings), from the insured, and from other sources available to the insurer** at the time the defense is demanded (or tendered)." *Turley*, 928 P.2d at 303-04; *Okmulgee Inn*, 451 Fed. Appx. at 748 ("the analysis is not restricted to the four-corners of the complaint" when determining an insurer's duty to defend).

In a case somewhat analogous to the instant case, the federal Oklahoma court found no duty to defend on a 12(b)(6) motion to dismiss a third-party complaint against a professional liability insurer. *See Hanover Ins. Co. v. Saul*, 2013 WL 812353 (W.D. Okla. Mar. 5, 2013). While this case involves a CGL insurance policy with a professional services exclusion, and an underlying case based solely on BTE's professional services, *Saul* presented the converse situation. In *Saul*, the underlying action involved a claim that the insured chiropractor's ex-husband had sexually assaulted her minor patients, and that she committed medical malpractice by failing to warn her patient of her ex-husband's history, and the Court dismissed the third-party declaratory judgment complaint against a professional liability insurer. *Id.* at *1, 5. While careful to note that "[t]he court is not attempting to determine the extent of a chiropractor's duties under Oklahoma law," it concluded that the "negligence alleged in the…lawsuit does not constitute an omission, act or error committed within the scope of her practice as a chiropractor," and dismissed the declaratory judgment complaint against the professional liability insurer. *Id.* at *4.

Here, the Underlying Complaint allegations, the underlying plaintiff's expert witness testimony, and the underlying plaintiff's opposition to BTE's summary judgment motion all demonstrate that BTE's alleged liability in the Underlying Action arises out of BTE's rendering or failure to render professional services – whether derived solely from its engineering services or

from its inspection, evaluation, audit, and design work for Jacobs. Accordingly, this Court should dismiss the Jacobs Complaint as against Colony.[49]

### D.   Additional Arguments – Bad Faith and Necessary and Indispensable Party

**Bad Faith:** Oklahoma law[50] provides for tort claims against insurers when "there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured."[51] However, where a court determines that the insurance policy does not provide coverage for a particular claim, there is no bad faith claim.[52] Because there is no duty to defend Jacobs or AT&T, Jacobs' bad faith claim should also be dismissed.

**Necessary and Indispensable Party:** Finally, to the extent that this action is not dismissed, the named insured, BTE, is a necessary and indispensable party to this case.[53] Jacobs asserts that it and AT&T are entitled to additional insured coverage under BTE's insurance policy, but (1) such coverage, per each of the additional insured endorsements, is premised on BTE's conduct and liability, and (2) BTE has an interest in preserving its insurance policy's limit of liability, because it is also a defendant in the Underlying Action.

## IV.   CONCLUSION AND PRAYER

Colony respectfully requests dismissal in its favor on all claims against it, and for such other relief to which it may be entitled, including attorneys' fees and costs.

---

[49] Jacobs alleges that Colony is defending BTE in the Underlying Action. *See* Jacobs Complaint, ¶ 37. While Colony has been sharing in BTE's defense with its professional liability insurer, the additional information that Jacobs relies upon here – including the expert witness testimony and opposition to BTE's summary judgment motion – underscores that this claim is in fact a professional liability claim.

[50] Because the Colony Policy is analyzed under Oklahoma law, Oklahoma law also controls any bad faith claims arising out of that insurance policy.

[51] *See McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla.1981) (quotation and emphasis omitted).

[52] *See VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226, 1234 (10th Cir. 2001) (Oklahoma law) (because the policies did not cover the claim, the insured had no bad faith claim against the insurers).

[53] *See, e.g., Truong v. St. Paul Fire & Marine Ins. Co.*, 345 Fed. Appx. 948 (5th Cir. 2009).

Respectfully submitted,

John C. Tollefson, Lead Counsel
Texas Bar No. 20109400
Tollefson Bradley Mitchell & Melendi, LLP
2811 McKinney Ave., Ste. 250
Dallas, TX 75204
P: 214.665.0100
F: 214.665.0199
JohnT@tbmmlaw.com

**Of Counsel**:
William F. Stewart
Stewart Smith
470 Norristown Road, Suite 201
Blue Bell, PA 19422
P: 484-344-5296
F: 484-534-9470
wstewart@StewartSmithLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this motion and brief was served by electronic transmission on December 6, 2017, upon the following individuals at the listed addresses:

Michael J. O'Connor, Esq.
Melanie McDonald, Esq.
Kelley Drye & Warren LLP
515 Post Oak Blvd., Ste. 900
Houston, TX 77027
moconnor@kelleydrye.com
mmcdonald@kelleydrye.com
*Attorneys for Plaintiff,*
*Jacobs Telecommunications, Inc.*

John Tollefson